*In re* MARRIAGE OF THOMAS WISNIEWSKI, Petitioner-Appellant, and VIRGINIA WISNIEWSKI, Respondent-Appellee.

Fourth District   No. 4—96—0270

Opinion filed January 14, 1997.

Michael B. Metnick and Diana N. Cherry (argued), both of Metnick, Wise, Cherry & Frazier, of Springfield, for appellant.

James M. Mullady and Patricia L. Gruber (argued), both of Meyer, Capel, Hirschfeld, Muncy, Jahn & Aldeen, P.C., of Champaign, for appellee.

JUSTICE COOK delivered the opinion of the court:

Thomas and Virginia Wisniewski were divorced in an order entered on June 8, 1981. Thomas appealed the property distribution established in the order, and this court reversed and remanded. *In re Marriage of Wisniewski*, 107 Ill. App. 3d 711, 437 N.E.2d 1300 (1982). On April 26, 1983, on remand, the trial court entered a new judgment, which reserved jurisdiction, until Thomas retired, to apportion the marital interest in his pension payments. The benefits were apportioned in an order dated March 22, 1996. Thomas appeals, arguing that the award gave Virginia a share of his earnings after dissolution. Virginia argues that the method of division was determined in the 1983 order, and this appeal is untimely. We hold that the 1983 order did not determine a method of apportionment and that the trial court did not abuse its discretion in dividing the pension. Accordingly, we affirm.

## FACTS

Thomas and Virginia were married 27 years. Three years prior to the marriage, Thomas became a participant in the Illinois Teacher's Retirement System (TRS). He remained a participant in TRS after the marriage, but he eventually switched to the Illinois State Universities Retirement System (SURS). Thomas continued to participate in SURS after the marriage was dissolved on June 8, 1981. Thomas is now entitled to a pension from each system.

Both the TRS and SURS plans are "defined benefit plans." Under the formula applicable to Thomas, the amount of benefits is the product of final average salary multiplied by a pension multiplier. Final average salary is the average of the salaries of 4 of the last 10 years in which the participant's salary was the highest. Under section 20—106 of the Retirement Systems Reciprocal Act (40 ILCS 5/20—106 (West 1994)), the same final average salary is used under both of Thomas' pension plans.

The pension multiplier starts at 1.67% and grows every year. It increases by 1.67% for each of the first 10 years of participation in each plan. It increases 1.9% for each of the next 10 years. 40 ILCS 5/15—136, 16—133(a)(B)(1) (West 1994). Thomas accrued a pension multiplier of 30% under the TRS plan. He accrued 5.01% of that multiplier prior to the marriage (3 x 1.67), and 24.99% during the

marriage. By the time of dissolution, Thomas had accrued a pension multiplier under the SURS plan of 24.3%. Thomas' SURS multiplier continued to grow after the dissolution.

An early retirement penalty equal to one-half of 1% is assessed against final payments for every month before age 60 a participant retires. 40 ILCS 5/15—136(b), 16—133(a)(B) (West 1994).

On remand in 1983, the trial court did not make an allocation of Thomas' retirement interest. Instead it provided:

"Jurisdiction is continued and retained to apportion between the parties according to marital share and supervise payments of the pension if, as, and when it becomes vested in and payable to Thomas. Thomas shall promptly notify this court and Virginia as soon as his retirement date is known so that the court can appropriately deal with the pension."

Thomas did not appeal that order.

Virginia had no pension in her own name at the time of dissolution. In the period between the dissolution and Thomas' retirement, she was employed by the University of Cincinnati, from which she is now retired. During that time she accrued, and now receives, a monthly pension benefit of $925.

As Thomas worked after dissolution, his pension increased for three reasons. First, he eliminated the early retirement penalty by working past age 60. Second, his salary continued to increase in this period, thereby increasing the "final average salary" for purposes of calculating his pension. 40 ILCS 5/20—106 (West 1994). Finally, his pension multiplier continued to receive yearly additions.

On August 21, 1994, Thomas retired, having notified the court and his former wife of his intention to do so. On November 2, 1994, Virginia filed a petition to allocate the pension. A hearing was held on that petition on February 20, 1996. At the hearing Thomas and Virginia made four stipulations: (1) they were married for 27 years; (2) Thomas contributed to the pension plans for 44 years; (3) the total monthly payout from the pension plans was $3,819.07; and (4) Thomas began receiving payments from his pension in September 1994. Both parties agree that Virginia is entitled to one-half of the marital interest in the pension, however that interest is valued. The trial court ordered Virginia to subtract from her share a corresponding share of Thomas' federal income tax on the pension benefits. She does not contest this part of the order on appeal.

Thomas argued at trial that the marital interest in his pension payments should be based on the amount of pension benefits accrued at the time of dissolution, without reduction for the retirement penalty. He would set the marital interest (of which Virginia is

entitled to one-half) as equal to the product of his final average salary at the time of dissolution multiplied by the pension multiplier that accrued during the marriage. At trial, Thomas produced a document from his SURS plan administrator. It indicated that if Thomas had retired upon dissolution of the marriage, his final average salary would have been $2,339 per month. Thomas multiplied this figure by 49.29%, the sum of the pension multipliers he accrued under each plan during the marriage. He thereby estimated the marital interest in each month's annuity payment to be $1,152.89. Virginia's share would be $576.45, less taxes.

The trial court rejected this approach. It stated that it was "compelled to follow" what it referred to as "the proportionality rule." Under that rule, the marital interest in the pension is equal to the total pension benefit times the ratio of years of marriage in which there was participation in the plan to total years of participation in the plan. See *In re Marriage of Hunt*, 78 Ill. App. 3d 653, 663, 397 N.E.2d 511, 519 (1979). The court in *Hunt* used the total pension benefits accrued at the time of retirement, not dissolution. *Hunt*, 78 Ill. App. 3d at 663, 397 N.E.2d at 519. The parties have stipulated that the total monthly payout at retirement was $3,819.07. The trial court determined the proportion of marital participation to total participation to be 27/44. The marital interest in each payment using the method employed by the trial court is the product of these two figures, $2,343.52. Virginia's share would be $1,171.76, less taxes.

We must first resolve the procedural issue raised by Virginia: whether Thomas' appeal is timely.

## TIMELINESS OF APPEAL

■ Virginia's argument that this appeal is not timely is based on her view of the procedure used to apportion the pension in the 1983 order. There are two alternate procedures for apportioning unmatured pensions upon dissolution. First, a court can "cash out" the pension upon dissolution. Under this approach, the court attempts to compute the present value of the pension with a discount to reflect the possibility that it will not vest. See *Wisniewski*, 107 Ill. App. 3d at 717, 437 N.E.2d at 1305. The court then determines the marital interest in the pension and divides it between the spouses, just like any other marital property. The court immediately awards the non-pensioner spouse other marital property, to compensate for the award of the entire pension to the pensioner spouse. The pensioner spouse is allowed to keep all pension benefits when they are eventually paid.

"If a trial court deems it best to divide the pension interest prior to vesting, it must take the value of the pension as

determined by actuarial evidence, discount this amount to an extent in consideration of the probability it will not vest, discount to present value, and then determine the marital portion of that amount. In some cases the trial court may be able to evaluate this risk in determining the value. (*In re Marriage of Brown* (1976), 15 Cal. 3d 838, 544 P.2d 561, 126 Cal. Rptr. 633.) However, generally it will require expert testimony regarding the discount factors and evidence to enable an evaluation of the probability the benefits will be enjoyed. (*Robert C.S. v. Barbara J.S.* (Del. 1981), 434 A.2d 383; *Heatwole v. Heatwole* (Wis. App. 1981), 103 Wis. 2d 613, 309 N.W.2d 380.) This method is best only where the pensioner is close to mandatory retirement age or retirement is otherwise imminent, and there are sufficient other marital assets to allow an offset to the nonpensioner spouse. *Shill v. Shill* (1979), 100 Idaho 433, 599 P.2d 1004." *In re Marriage of Wisniewski*, 107 Ill. App. 3d 711, 717, 437 N.E.2d 1300, 1305 (1982).

If it is too difficult to assign a present value to the marital interest, or if the "cash out" approach is otherwise impractical, a court may use a reserved jurisdiction approach. Under such an approach, the court does not immediately compensate the nonpensioner spouse. Instead, it orders that the employee spouse pay the nonemployee spouse his or her portion of the marital share "if, as, and when" the pension plan becomes mature. *Hunt*, 78 Ill. App. 3d at 663, 397 N.E.2d at 519.

There are two variants of the reserved jurisdiction approach. At the time of dissolution, the court can devise a formula that will later determine both the marital interest and the nonpensioner's share in the benefits. This formula produces a percentage, which will be multiplied by the pension payments as they are actually received. *E.g., Hunt*, 78 Ill. App. 3d at 663, 397 N.E.2d at 519. Under the other reserved jurisdiction variant, the trial court waits until benefits are to be paid before it determines the formula for determining the marital interest or the nonpensioner's share. *E.g., In re Marriage of Alshouse*, 255 Ill. App. 3d 960, 961-62, 627 N.E.2d 731, 732-33 (1994).

Virginia argues that the first reserved jurisdiction procedure was used in the 1983 order, which established the method of apportionment at that time. If the 1983 order decided the method of apportionment, Thomas could have appealed it immediately (see *In re Marriage of Burkhart*, 267 Ill. App. 3d 761, 766, 643 N.E.2d 268, 272 (1994)), and this appeal is untimely. Virginia argues that this court's decision in 1982 and the "if, as, and when" language in the 1983 order implied that the *Hunt* proportionality rule be used. Thomas denies that the 1983 order sufficiently resolved the issue of the method of division to allow appeal at that time. Thomas argues that

the method was not established until the 1996 order. Therefore, he argues, his appeal is timely.

Thomas also contends that Virginia waived this argument by failing to raise it at trial. See *Fitts v. Industrial Comm'n*, 172 Ill. 2d 303, 308, 666 N.E.2d 4, 6 (1996). Thomas' waiver argument ignores the fact that Virginia's claim is jurisdictional in nature. This court has jurisdiction to hear an appeal only if that appeal is timely filed. 155 Ill. 2d R. 303.

■ This court did not attempt to determine the method of apportionment in 1982. In fact, we indicated that the trial court could "cash out" the pension if it had sufficient evidence to do so. *Wisniewski*, 107 Ill. App. 3d at 717, 437 N.E.2d at 1305. On remand in 1983, the trial court ordered that payments be made "if, as, and when" the pension benefits become vested and payable to Thomas. Virginia claims that this "if, as, and when" language established the *Hunt* proportionality method. However, this language refers to the timing of apportionment, not the method of apportionment. See *In re Marriage of Rosenow*, 123 Ill. App. 3d 546, 462 N.E.2d 1287 (1984). A proportionality rule need not compare years in the marriage with years outside the marriage. It could compare the amount of contributions during the marriage with the amount of contributions outside the marriage, or compare other factors. See *In re Marriage of Benz*, 165 Ill. App. 3d 273, 285, 518 N.E.2d 1316, 1323 (1988).

Virginia argues that the trial court in 1983 did not follow the appropriate procedures under the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/101 *et seq.* (West 1994)) to reserve a decision on the issue of the method of distribution. Section 401(b) of the Act only allows reservation of the issue of disposition of property upon agreement of the parties, or motion of one party and appropriate findings by the trial court. 750 ILCS 5/401(b) (West 1994). Neither occurred here. Virginia's reliance on section 401(b) of the Act does not advance her argument. If the trial court improperly reserved jurisdiction to determine the method of distribution without following the appropriate procedures, the order was still not final for purposes of appeal until the method of distribution was established. See *Burkhart*, 267 Ill. App. 3d at 765, 643 N.E.2d at 271. In that event, the present appeal is still timely.

In 1983, the trial court chose not to decide the method of apportionment. We question that approach. Though this court's decision in 1982 made it clear that it was appropriate to reserve jurisdiction to cash out the respective shares, there was no reason to delay the choice of a formula of apportionment. A trial court has the authority to delay this choice (see *Alshouse*, 255 Ill. App. 3d at 961-

62, 627 N.E.2d at 732-33), but it should only do so when absolutely necessary. Because the parts of a dissolution decree are interdependent, delaying a decision on part of a decree may delay appeal of the rest of it. *In re Marriage of Leopando*, 96 Ill. 2d 114, 119, 449 N.E.2d 137, 140 (1983). A property division that reserves jurisdiction to apportion a pension without deciding the method of apportionment is not final for purposes of appeal. *Rosenow*, 123 Ill. App. 3d at 548, 462 N.E.2d at 1288. Disputes such as this one should not be allowed to linger for over a decade.

It is clear, however, that the 1983 order did not apportion the marital interest in Thomas' pension. That apportionment was not made until the 1996 order was entered. Therefore, Thomas' appeal was timely.

## METHOD OF APPORTIONMENT IN THE 1996 ORDER

Because the method of apportionment had not been determined earlier, the trial court had discretion to consider the evidence before it and devise a method of its own. *Benz*, 165 Ill. App. 3d at 285, 518 N.E.2d at 1323. This court will not reverse a trial court's choice of an apportionment method absent an abuse of discretion. *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 979, 605 N.E.2d 670, 681 (1992); *Benz*, 165 Ill. App. 3d at 285, 286, 518 N.E.2d at 1322, 1323.

■ The first issue is whether the trial court exercised any discretion at all. A trial court's ruling must be reversed on appeal where it palpably fails to exercise its discretion because it wrongly believes that it is not free to do so. *People v. Stack*, 261 Ill. App. 3d 191, 633 N.E.2d 42 (1994); *People v. Partee*, 268 Ill. App. 3d 857, 645 N.E.2d 414 (1994).

When the trial court announced its decision, it stated that it felt "compelled to follow the *Hunt* rule." To "compel" means "to drive or urge forcefully or irresistibly." Merriam-Webster's Collegiate Dictionary 234 (10th ed. 1996). This phrase is consistent with the notion that the court considered the evidence before it and was strongly convinced to exercise its discretion by applying the proportionality rule. Compare *Stack*, 261 Ill. App. 3d at 199, 633 N.E.2d at 47 (trial court failed to exercise discretion when it stated that it was "required" to take a specific course of action); *Partee*, 268 Ill. App. 3d at 868-69, 645 N.E.2d at 422 (trial court failed to exercise discretion when it stated several times that it was unable to take an alternate course of action).

■ When reviewing a trial court's decision, a judge's oral comments before announcing his or her decision should be taken in the context of the record as a whole. *People v. Ward*, 113 Ill. 2d 516, 526-

27, 499 N.E.2d 422, 425-26 (1986). The record shows that Judge Miller recognized that neither Illinois law nor the history of this case prohibited him from exercising his discretion. Judge Miller stated at trial that he "could have" entered an order allocating Thomas' pension in 1983 "instead of reserving the issue of allocation of pension until now." This comment indicated that he realized that the 1983 order did not establish a method of distribution. The trial court also requested written post-trial memoranda from the parties on the method of apportionment before it reached its decision. Judge Miller indicated by his comments that he had considered these memoranda, including those cases in which the trial court exercised its discretion by not applying the *Hunt* rule. We conclude the trial court exercised its discretion here.

Thomas argues it is inequitable to award his ex-wife increases in benefits that compensate him for work he performed after the marriage was dissolved. Virginia counters that an award based solely on the benefits that had accrued at the time of the dissolution would not compensate her for the delay between dissolution and payment of benefits.

The fifth district found an argument similar to Thomas' compelling in *In re Marriage of Blackston*, 258 Ill. App. 3d 401, 630 N.E.2d 541 (1994). In *Blackston*, the trial court had awarded an ex-wife a share of her ex-husband's pension as calculated using the proportion of years in the marriage to total years in the plan. *Blackston*, 258 Ill. App. 3d at 404, 630 N.E.2d at 544. At trial, the ex-wife had argued that an alternate method, which severed the benefits accruing during the marriage, did not compensate her for the interest she would have earned on the benefits between dissolution and payment. The appellate court ruled that the method employed by the trial court was inappropriate since the ex-wife failed to provide adequate evidence of her lost interest under the alternate method. The court remanded the case so that more evidence could be heard. *Blackston*, 258 Ill. App. 3d at 407-08, 630 N.E.2d at 546. In the instant case, as in *Blackston*, no evidence was presented to establish how much money Virginia lost due to the delay between dissolution and payment.

■ We choose not to follow *Blackston* here. Illinois law has long recognized the time value of money. See *Wisniewski*, 107 Ill. App. 3d at 717, 437 N.E.2d at 1305 (reducing pension plan benefits to present value before calculating the marital interest in them); Illinois Pattern Jury Instructions, Civil, No. 34.02 (3d ed. 1989). We see little value in forcing the nonpensioner spouse to prove that proposition. *Alshouse*, 255 Ill. App. 3d at 963, 627 N.E.2d at 733-34; see also 1 H. Gitlin, Gitlin on Divorce: A Guide to Illinois Matrimonial Law § 8.09(a)(4), Note 250.07, at 135—2 through 135—3 (1995).

Our reasoning is not altered by the fact that the pension plans at issue here and in *Blackston* are defined benefit plans. Thomas notes that benefits in such a plan increase solely because of post-marital efforts. He argues that benefits are not designed to provide interest on contributions. Thomas argues that despite the time value of money, his contribution of $100 to a plan in 1954, the first year of the marriage, was worth no more than his contribution of $100 to a plan in 1994, the year he retired. That is because his pension benefits do not depend on the amount of his contributions or the interest earned by his contributions. Instead his pension benefits are computed by multiplying his pension multiplier by his final average salary. According to the argument, the annual increment in the pension multiplier was no greater for 1954 than it was for 1994. In fact it was less—the amount of the increment was 1.67% in 1954, and 1.9% in 1994. Thomas' argument ignores economic realities. No matter how the payment of pension benefits is calculated under the language of the particular plan, the fact of the matter is that contributions in the early years are more valuable to the payor of the plan than are payments in the last years. Virginia cannot be deprived of the interest earned by marital contributions just because the pension plan does not specifically account for that interest in determining the pension benefit.

These plans do in fact include guarantees that a participant receives the equivalent of interest on contributions. The defined benefit method of calculating retirement benefits is only used if it yields a larger annuity than a sum of figures listed by statute. One of these is "[a]n amount that can be provided on an actuarially equivalent basis by the member's accumulated contributions at the time of retirement." 40 ILCS 5/16—133(a)(A)(1) (West 1994); see also 40 ILCS 5/15—116 (West 1994). Under both TRS and SURS plans this amount compensates for interest on contributions. See 40 ILCS 5/15—173, 16—113 (West 1994).

Thomas argues that his share of the pension should be greater because in the years after the marriage his annual increments were valued at 1.9%, and for many of the years of the marital years they were valued at only 1.67%. Nevertheless, the greater-value later years would not have been possible without the lesser-value earlier years. We cannot say the years after the marriage were more valuable than the years during the marriage. Because of the time value of money, the opposite would appear to be true, unless contributions were significantly greater in later years.

Thomas argues that his final average salary was based on years of employment after the marriage. He argues that the marital inter-

est in the pension should be limited to the amount of his salary at the time of the 1981 divorce, and that any increase in pension benefits due to a higher salary are due solely to his post-marital efforts. We disagree. Clearly the increase in pension benefits was not due "solely" to post-marital efforts. The final average salary was multiplied by 1.67% or 1.9% *for each year of the marriage.* We see no reason why Virginia should not receive her one-half of whatever is produced by a marital 1.67% or a marital 1.9%. The salary during the last year of marriage is a nonfactor. The pension multiplier could have been multiplied by the average income of persons in the United States, or by a percentage of the gross national product, as well as by Thomas' final average salary. Another consideration is that the salary in 1981 may be roughly equivalent to the salary in 1994. The salary in 1994 is greater because the cost of living has increased over the years. If Virginia had received benefits in 1981, she would have been limited by the salary at that time, but she did not receive benefits until 1994.

Thomas argues that the marital share should be limited to what he would have received if he had quit his job at the time of the dissolution of the marriage. The fact of the matter is that Thomas did not quit his job, and the years of the marriage produced additional benefits for him after the marriage. If Thomas in good faith had chosen to quit his job and forfeit those additional benefits, then we would agree that Virginia would have been limited by what was available. Both parties would then have been disadvantaged by the termination. We see no reason, however, why Virginia should receive all the disadvantages of a hypothetical termination, and Thomas all the advantages of the actual continued employment, when those advantages are due in part to work during the marriage.

It is a complicated question to determine what part of these pension benefits is marital and what part is nonmarital. It would have been helpful if the parties had presented expert testimony on this issue, but the trial court did its best with what the parties gave it. We cannot say the trial court was wrong. Thomas cannot complain the trial court did not have enough evidence to decide this case when Thomas did not take advantage of his opportunity to present that evidence. If Thomas believed that the *Hunt* rule being considered by the court overcompensated Virginia and thereby awarded her the product of his nonmarital earnings, he was free to present such evidence at trial. Where parties have had the opportunity to present evidence at trial, they should not be allowed on appeal to take advantage of their failure to do so. *Benz,* 165 Ill. App. 3d at 285, 518 N.E.2d at 1323; *In re Marriage of Mullins,* 121 Ill. App. 3d 86, 90, 458 N.E.2d 1360, 1363 (1984); *In re Marriage of Smith,* 114 Ill. App. 3d 47, 54, 448 N.E.2d 545, 550 (1983).

■ Finally, Thomas argues that it is inequitable to award his ex-wife a share of the pension benefits accrued after the dissolution without awarding him a share of the pension benefits she accrued in the same period. However, Thomas cannot equate the increase in benefits received through his plan after 30 years of service with the starting benefits Virginia received. Again, part of the benefits Thomas accrued after the dissolution were due to contributions made during the marriage. That is not the case with Virginia's University of Cincinnati plan.

The trial court's division of Thomas' pension benefits was not an abuse of discretion.

## CONCLUSION

For the reasons stated above, the decision of the trial court is affirmed.

Affirmed.

McCULLOUGH and GARMAN, JJ., concur.